# UNITED STATES DISCTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH PETER MAZIARKA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 C 5897** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Joseph Maziarka ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner")[1] denying Plaintiff's applications for Title XVI Supplemental Security Income ("SSI") and Title II Disability Insurance Benefits. Plaintiff requests that the decision of the Administrative Law Judge ("ALJ") be set aside or, in the alternative, that the matter be reversed and remanded for further proceedings. Presently before the Court is the Commissioner's motion for summary judgment. For the reasons set forth below, the Court denies the Commissioner's motion for summary judgment and remands this case for further proceedings consistent with this opinion.

### RELEVANT FACTS[2]

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, replacing Michael J. Astrue. Pursuant to Federal Rule of Civil Procedure 25, Carolyn Colvin is automatically substituted as Defendant.

[2] Citations to (R.—) refer to the record number that a document is assigned on the docket for this case. Citations to (A.R.—) refer to the administrative record of these proceedings, which was filed as (R. 16) on the docket.

Plaintiff was born on March 25, 1981, and resides in Round Lake, Illinois. (A.R. 71, 136.) His employment history includes working as a technician with Jiffy Lube, and most recently as an installer for a glass company. (A.R. 153; R. 11, Pl.'s Br. at 2.) Plaintiff was last insured on March 31, 2008. (A.R. 75.) On May 14, 2011, Plaintiff applied for SSI and disability benefits. (A.R. 13.) These claims were denied on September 2, 2010. (*Id.*) Plaintiff filed for reconsideration on October 8, 2010, but his request was denied on November 12, 2010. (R. 11, Pl.'s Br. at 1.) Plaintiff subsequently requested a hearing before an ALJ on November 17, 2010. (A.R. 92.) The hearing was held on August 30, 2011, in Evanston, Illinois. (A.R. 96, 102.) On September 20, 2012, the ALJ issued an opinion denying Plaintiff's claim for SSI benefits and disability benefits. (A.R. 14.)

Plaintiff suffers from several medical issues, including degenerative disk disease, lower back pain, numbness in his legs, and anxiety. (A.R. 245-46, 254.) Plaintiff's relevant medical history begins just after a work-related accident on December 6, 2002. (A.R. 245.) Plaintiff, who worked for a glass company at the time, was carrying a 130-inch mirror up a winding staircase with a coworker. (*Id.*) The mirror, which weighed approximately 170 pounds, got caught on the railing. (*Id.*) Plaintiff had to stretch and twist his body in order to lift the mirror over the railing and, in doing so, heard three pops in his lower back. (*Id.*) He experienced immediate pain in his back and lower legs. (*Id.*) After this incident, Plaintiff tried to continue working with light duty restrictions, but he was fired three weeks after the incident due to his inability to engage in heavy lifting or work for extended periods without taking breaks. (*Id.*)

Plaintiff was subsequently diagnosed with degenerative disk disease and a herniated

nucleus pulposus.[3] (A.R. 254.) He has undergone two significant surgeries, a variety of outpatient procedures, and cortisone injections in attempts to correct his condition. (A.R. 267-68, 328-62.) Plaintiff alleges that he is unable to work due to symptoms related to his condition, including pain and discomfort, numbness, and problems walking long distances and sitting for extended periods. (A.R. 246.) Plaintiff also alleges that he suffers from anxiety related to his pain, which impacts his day-to-day life. (A.R. 401.)

## I.     Medical Evidence of Physical Impairment

The administrative record contains no direct evidence of the medical attention Plaintiff sought from the date of his injury until December 30, 2004, when Plaintiff had a consultation with Dr. Jay Levin. (*Id.*) Dr. Levin transcribed the medical treatment that Plaintiff reported he received in the intervening period of time since his injury. (*Id.*) Plaintiff had sought treatment for a range of symptoms related to his injury, including pain in his lower back, buttocks, calves, and thighs. (A.R. 245-46.)

### A.     Treating Physicians' Records

At the consultation, Plaintiff complained of consistent numbness in his feet and told Dr. Levin that he always felt cold. (*Id.*) Plaintiff reported having difficulty walking for longer than ten minutes, standing for extended periods, and lifting objects such as a gallon of milk. (A.R. 246.) Dr. Levin ordered an MRI in January 2005, which revealed degenerative changes at Plaintiff's L3-L4 and L4-L5 disks and a significant left L3-L4 bulge that Dr. Levin concluded was a herniation. (A.R. 248.) In addition, there was a small right L4-L5 disk herniation. (*Id.*) Plaintiff began physical therapy and received cortisone injections, but his condition failed to improve. (A.R. 248-52.) After a Somatosenory Evoked Potential ("SSEP") exam in June 2005,

---

[3] This condition is commonly known as a herniated (slipped) disk. *Herniated Disk*, Medline Plus, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited Nov. 5, 2013).

Dr. Levin opined that Plaintiff was suffering from a right and central herniated nucleus pulposus. (A.R. 254.) On August 30, 2005, Plaintiff underwent his first surgery for his condition, a left L3-L4 decompressive laminectomy[4] and right L4-L5 hemilaminotomy and microdiscectomy. (A.R. 240.)

Plaintiff initially experienced relief after his surgery, but his lower back pain and numbness in his calves soon returned. (A.R. 261-67.) Over the course of the next year, Plaintiff continued physical therapy and cortisone injections, but his pain and discomfort worsened. (*Id.*) Dr. Levin identified a central recurrent disk herniation in February 2006. (A.R. 269.) On July 18, 2006, Plaintiff had his second surgery, an L3-L4 decompressive laminectomy and fusion at the L3-L4 and L4-L5 disks. (A.R. 244.) Unfortunately, Plaintiff continued to report constant pain and soreness in his lower back and numbness in his calves. (A.R. 461-70.) In August 2006, Plaintiff underwent a lumbar decompression and fusion of the L3-L4, and L4-L5 disks. (A.R. 291.) Dr. Levin continued to find evidence of spinal stenosis and recurrent herniation at the L4-L5 disks. (A.R. 293.)

Treatment records kept by Dr. Quinn Regan, Plaintiff's treating orthopedic surgeon, indicate improvement of Plaintiff's disk irregularities over time but little improvement in terms of Plaintiff's subjective pain levels. (A.R. 334.) In February 2006, Dr. Regan noted prominent broad-based bulging of the L4-L5 disks. (A.R. 340.) In December 2006, Dr. Regan noted improvement and an absence of herniation or spinal stenosis.[5] (A.R. 334-35.) In August 2007, Dr. Regan observed a moderate increased right paracentral disk protrusion. (A.R. 330.)

---

[4] A laminectomy is a surgical operation in which the posterior arch of a vertebra is removed. J.E. Schmidt, *Attorneys' Dictionary of Medicine,* Vol. 3, L-65776 (Matthew Bender, 2009).

[5] Spinal stensosis is the narrowing of the spinal canal, usually as a result of hypertrophic (pertaining to abnormal enlargement) degenerative changes of the bony structures. *Id.* at Vol. 5, S-108246.

On November 30, 2007, Dr. Yuriy Bukhalo performed a radiofrequency ablation of the L2, L3 and L5 disks. (A.R. 279.) The procedure was performed again one week later on December 6, 2007. (R. 11, Pl.'s Br. at 7.) On March 20, 2008, Dr. Regan's treatment records noted that Plaintiff could return to medium-level work lifting fifty pounds on a regular basis. (A.R. 348.) Nearly two years later, on June 24, 2010, Dr. Regan noted that despite Plaintiff's complaints of lower back and leg pain, his gait was normal and that he could perform lateral bends of five degrees in both directions. Dr. Regan recommended that Plaintiff "keep as active as possible." (A.R. 347.)

Plaintiff saw Dr. Richard Margolin of the Waukegan Clinic Corporation three times between August and October of 2010. (A.R. 391-99.) Plaintiff continued to report pain in his back and worsening pain and numbness in his legs. (A.R. 393, 398.) Dr. Margolin noted limited rotation of the lumbar spine and limited ability to bend sideways. (A.R. 394.) In one incident in 2010, Plaintiff reached for a box in his closet and experienced immediate pain and spasms in his back. (A.R. 396.) This incident caused ongoing back spasms and increased pain levels. (A.R. 396, 399.) Dr. Margolin's assessment was that Plaintiff suffered from degenerative disk disease, and he ordered radiologic imaging that is not included in the record. (A.R. 394, 399.)

### B.    Physical Therapy Reports

Plaintiff underwent physical therapy at Sports Physical Therapy & Rehab Specialists from October 2006 to February 2007. (A.R. 459-511.) In November 2006, three months after his lumbar decompression and fusion at the L3-L4 and L4-L5 disks, Plaintiff reported feeling stronger, and his physical therapist noted that Plaintiff was slowly progressing. (A.R. 477.) Over the following months, however, Plaintiff's pain worsened, and the numbness and burning sensation in his legs and buttocks returned. (A.R. 488, 499.)

## C. Melrose Park Clinic's and Stroger Hospital's Records

The record on appeal contains approximately one hundred pages of documentation from Melrose Park Clinic (the "Clinic"), where Plaintiff received assessments, evaluations and medication for managing pain between May 2004 and March 2011. (A.R. 519-647.) It appears that Plaintiff was treated by Dr. Paul Madison during at least the latter part of his time at the Clinic. (A.R. 613-46.) While receiving treatment at the Clinic, Plaintiff twice reported a pain level of six, but his pain level was generally between a three and a four. (A.R. 560-611.) On October 26, 2010, however, Plaintiff reported a pain level of eight resulting from constant lower back pain and anxiety. (A.R. 609.)

Plaintiff visited Stroger Hospital on January 21, 2011, and February 18, 2011, upon referrals from the Clinic. (R. 11, Pl.'s Br. at 9; A.R. 512-18.) Dr. Diane Sierens ordered an MRI of the lumbar spine on January 21, 2011. (A.R. 514.) The MRI results revealed that Plaintiff suffered from multilevel degenerative disk disease and failed back surgery syndrome and that he was "completely disabled." (A.R. 514-15.) On March 18, 2011, Dr. Madison corroborated Stroger Hospital's finding that Plaintiff suffered from failed back surgery syndrome. (A.R. 618.)

## D. Disability Determination Service Assessment

The Disability Determination Service ("DDS") conducted a Residual Functional Capacity ("RFC") Assessment in August 2010 and concluded that Plaintiff's statements of his own limitations seem "somewhat excessive when compared to the medical evidence." (A.R. 433.) DDS concluded that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. (A.R. 432-33.) It also concluded that he was able to stand or walk, with normal breaks, for six hours in an eight-hour work day. (*Id.*) DDS refused to adopt Dr. Regan's assessment that Plaintiff could return to medium-level work, however, because it determined that Plaintiff's

report of his pain level, which would prevent him from performing medium-level work, was credible. (A.R. 437.)

## II. Medical Evidence of Mental Impairment

On August 12, 2010, Dr. William Lee conducted a psychiatric evaluation of Plaintiff for the purposes of his disability application. (A.R. 400-02.) Plaintiff reported that he was content and positive prior to his accident, but that since his accident he suffered from anxiety related to his pain. (A.R. 401.) Dr. Lee's evaluation stated that Plaintiff took Xanax for his anxiety and analgesics for pain management. (*Id.*) Plaintiff presented no other symptoms of mental impairment. (A.R. 400-02.) Consequently, Dr. Lee did not diagnose Plaintiff with a psychiatric disorder and concluded that there was insufficient evidence to support any claim of mental disability. (A.R. 402.)

DDS conducted two separate psychiatric reviews. The first evaluation assessed Plaintiff's mental status from December 6, 2002, the date of the alleged onset of the disability, to March 31, 2008, the last date he was insured, and concluded that there was an absence of evidence to support Plaintiff's claim of disabling anxiety. (A.R. 403-16.) The second evaluation focused on the period between May 14, 2010, and June 25, 2010, when Plaintiff filed for SSI and disability benefits. (A.R. 417-30) In this second review, DDS concluded that Plaintiff's anxiety was a secondary byproduct of his physical impairments and constituted a "non-severe limitation." (A.R. 427-29.) DDS noted that Plaintiff's anxiety moderately restricted his activities and daily life. (A.R. 427.)

## III. The ALJ Hearing

ALJ Robert Asbille conducted Plaintiff's hearing on August 30, 2011. (A.R. 13.) Plaintiff appeared in person and was represented by his attorney, Perry Smith. (*Id.*) Dr. Charles

Metcalf, a medical expert ("ME"), and William Newman, a vocational expert ("VE") from Triune Health Group, provided additional testimony. (*Id.*)

### A.     Plaintiff's Testimony

Plaintiff recounted his medical, employment, and personal history. (A.R. 32-36.) He dropped out of high school and later passed a high school equivalency exam. (A.R. 34.) Plaintiff testified about the extent of his pain and discomfort, stating that he suffers from constant pain in his lower back and sharp, burning pain down both his legs. (A.R. 35.) He testified to experiencing tingling and numbness in his legs and buttocks and occasional loss of sensation in his feet altogether. (*Id.*)

Plaintiff testified that he has not worked since 2002 due to the back injury he suffered while working for a glass company. (A.R. 34-35.) He further testified that as a result of his injury, he underwent two surgeries and several additional procedures including epidurals, discographies, myelograms, and cortisone injections. (A.R. 35-36.) His first surgery was a laminectomy of his L4-L5 disks on August 20, 2005, and his second was a two-level fusion on his L3-L4/L4-L5 disks on July 18, 2006—both to correct the irregularities in his disks. (A.R. 36.) He also testified to undergoing a rhizotomy, where his doctor cauterized the nerves in his legs, in 2008. (*Id.*) Plaintiff testified that sometimes the pain would lessen after the procedures, but it would always return as strong as before. (*Id.*)

Plaintiff testified that his pain makes it difficult to perform almost any daily activity and that he has difficulty sleeping. (A.R. 37.) Plaintiff lives with his father and is taken care of by his fiancée. (A.R. 33, 40.) Plaintiff testified that his chronic back pain impacts his appetite and he "almost never" eats. (A.R. 38.) He testified that his pain makes concentrating difficult and mentally depresses him. (*Id.*) He stays in bed most of the day until someone can help him move

to an armchair elsewhere in his home. (A.R. 40.) He has difficulty going up and down stairs, and because his bedroom is on a separate floor from the bathroom, he has to use a bedpan if someone is not available to help him. (A.R. 41-42.) Plaintiff testified that he is unable to drive for more than a couple hours due to his back pain. (A.R. 33.) Plaintiff also stated that he is unable to sit or stand for long periods of time due to pain in his back and feet. (A.R. 40-41.)

When questioned by his counsel, Plaintiff testified that on a scale of one-to-ten, his pain level is a six at best and a nine at worst. (A.R. 42.) When asked how often his pain is extreme, Plaintiff stated, "I haven't had a six in a long—in a few months now. It's been an eight or a nine for the last few months." (*Id.*) He further testified that the radiating pain is his legs and numbness in his feet are constant, even when the pain level varies. (A.R. 43-44.) While Plaintiff is prescribed a variety of pain medications, he testified that medication merely "takes the edge off," and he has more success using heat and cold to manage the pain. (A.R. 44.)

While he was being questioned, Plaintiff asked to stand due to his discomfort and testified that he can sit for approximately five to ten minutes before needing to shift positions. (*Id.*) He testified that he can walk half of a city block before needing to rest, and that sometimes he needs to be picked up by his fiancée after walking one block because he is unable to complete the return trip. (A.R. 46.) He testified that he can lift a gallon of milk but is unable to carry it through or out of the grocery store. (A.R. 47.)

Plaintiff testified that the constant pain in his back causes him to be depressed, and that he has thought about hurting himself. (A.R. 38.) Plaintiff stated that he could not afford to seek psychiatric treatment due to his lack of income and insurance. (A.R. 37.) At the time of the hearing, Plaintiff had not visited a psychiatrist other than Dr. William Lee, who conducted a psychiatric exam for the purposes of Plaintiff's SSI and disability benefits application. (*Id.*)

## B.    Medical Expert's Testimony

The ME testified that while he had not personally examined Plaintiff, he had reviewed the medical evidence that was provided to him. (A.R. 50.) The ME noted an absence of direct evidence from any medical consultations between the date of injury in December 2002 and Plaintiff's consultation with Dr. Jay Levin in December 2004. (*Id.*) An MRI at that time revealed bulging disks at L3-L4 and L4-L5, and another MRI in May 2005 revealed further degeneration and a protruding disk. (A.R. 51.) The ME noted that Plaintiff's August 2005 laminectomy to address his radiculopathy was unsuccessful, and Plaintiff's pain persisted. (A.R. 52.)

The ME testified that the medical records demonstrate persistent degeneration from 2004 to July 2006, when Plaintiff had his second surgery. (A.R. 52-53.) He further testified that, based on Dr. Regan's notes, Plaintiff's condition improved significantly after this surgery. (A.R. 53.) Plaintiff's straight-leg raising[6] was normal by December 2006, and an MRI performed on December 21, 2006, demonstrated resolution of all disk protrusions. (*Id.*) The ME testified that Plaintiff's complaint of pain persisted. (*Id.*) He testified that although a small disk protrusion remained in the lower thoracic area as of August 2007, Dr. Regan's treatment records indicated no central or foraminal narrowing since the surgery. (A.R. 54.) The ME also noted that Dr. Bukhalo conducted radiofrequency ablation of the nerve roots in 2007 to provide relief for Plaintiff's pain, and that in January 2008, Plaintiff experienced a "significant reduction in leg and back pain" and "was at maximal improvement." (*Id.*)

The ME noted a discrepancy in Dr. Regan's evaluations. (A.R. 54-55.) In January 2008, Dr. Regan recommended that Plaintiff not return to work, but two months later, Dr. Regan

---

[6] A straight-leg test is a common procedure performed to determine whether a patient with lower back pain has a herniated disk.

opined that Plaintiff could do medium-level work, lifting 50 pounds regularly and 100 pounds occasionally. (*Id.*) The ME found the second assessment of Plaintiff's capabilities "surprising" and "a little hard to believe." (A.R. 55.)

Next, the ME noted a two-year gap in the records between March 2008 and June 2010, and testified that in June 2010, Dr. Regan classified Plaintiff's condition as normal. (*Id.*) He contrasted this assessment with Plaintiff's February 2011 evaluation at Stroger Hospital, where he was diagnosed with failed back syndrome and deemed "completely disabled." (*Id.*) The ME testified that the conflicting reports present a challenge to determining an appropriate RFC. (A.R. 56.)

When questioned by counsel, the ME testified that the pain management records from Melrose Park Clinic are relatively unreliable on their own, as each person experiences pain differently. (A.R. 59-61.) In addition, the ME testified that the records of treating physicians are much more comprehensive and probative of a patient's condition than records from a single examination by a new doctor. (A.R. 61.)

The ME concluded that there was a lack of evidence that Plaintiff currently suffers from radiculopathy or a displaced disk, despite Plaintiff's complaints of pain. (*Id.*) The ME could not verify Stroger Hospital's assessment that Plaintiff was "completely disabled" because it was not "a very complete examination." (A.R. 56-57.) The ME stated, "clearly, there is disability. I have great difficulty in saying that the record indicates that he meets [listing] 1.04." (A.R. 57.) The ME concluded that Plaintiff could operate at a sedentary level if he had the option to change positions as needed. (*Id.*)

## C. Vocational Expert's Testimony

The ALJ questioned the VE within the parameters of the ME's conclusion, asking what type of work Plaintiff could do if he could hypothetically lift five to ten pounds and needed to be able to alternate between sitting and standing. (A.R. 62.) The VE testified that Plaintiff would be unable to return to his past relevant work, but that with the proposed limitations existed several jobs in the region, such as bench assembler, sorter, and small parts assembler. (A.R. 62-63.)

The ALJ proposed another hypothetical, whereby Plaintiff had the same limitations as in the first scenario, but would also be unable to maintain regular attendance due to his health and pain. (A.R. 63.) Under those circumstances, the VE concluded that no jobs existed that Plaintiff could perform. (*Id.*) Upon questioning by counsel, the VE stated that Plaintiff would be able to maintain his current dosage of pain medication and still secure work with his limitations, as long as the work did not involve heavy machinery. (A.R. 64.)

## IV. The ALJ's Decision

On September 20, 2010, the ALJ determined that Plaintiff was not disabled from December 6, 2002, the alleged onset date, through the date of his decision. (A.R. 14.) The ALJ concluded that Plaintiff was not entitled to SSI or disability benefits. (*Id.*) In order to make this determination, the ALJ applied the requisite five-step disability analysis required by the Act. (A.R. 14); 20 C.F.R. § 416.920.[7]

First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since he allegedly became disabled. (A.R. 15.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of degenerative disk disease and anxiety. (*Id.*) The ALJ

---

[7] Because the processes of evaluation for disability benefits and SSI are virtually identical in all respects relevant to the case, the Court will cite only to the SSI sections, found at 20 C.F.R. § 416.901 *et seq.* The parallel disability benefits regulations are found at 20 C.F.R. § 404.1501 *et seq. See Cirelli v. Astrue*, 751 F. Supp. 2d 991,1009 n.3 (N.D. Ill. 2010).

noted that the impairments were severe because they cause more than minimal limitations on Plaintiff's ability to work. (*Id.*)

At step three, the ALJ concluded that Plaintiff's combination of impairments did not meet or equal any of the listed impairments contained within 20 C.F.R. § 404, Subpart P, Appendix 1. (A.R. 16.) Specifically, the ALJ found that Plaintiff's pain-related anxiety did not sufficiently restrict his daily living, social functioning, or concentration to satisfy the listing under the Act. (*Id.*) Accordingly, before proceeding to step four, the ALJ assessed Plaintiff's RFC and concluded that he could perform sedentary work as defined in 20 C.F.R. § 416.967(a), except that he could lift and carry up to five pounds frequently and ten pounds occasionally. (A.R. 17.) Specifically, the ALJ found that Plaintiff could not climb ladders, climb ropes or scaffolds, bend, or work around unprotected heights or dangerous moving machinery. (*Id.*) The ALJ further noted that Plaintiff could sit/stand for six hours of an eight-hour workday, with a sit/stand option every 45 to 60 minutes. (*Id.*) The ALJ also found that Plaintiff's ability to concentrate and interact with coworkers was limited by his condition. (*Id.*) Further, the ALJ concluded that Plaintiff's testimony concerning his own capabilities and the intensity of his ailments was not credible to the extent that it conflicts with the concluded RFC. (A.R. 17-18.)

At step four, the ALJ concluded that Plaintiff is unable to return to his past relevant work. (A.R. 20.) Finally, at step five, after considering the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff was capable of making an adjustment to sedentary work with an option to sit or stand. (A.R. 17-21.) Consequently, the ALJ concluded that Plaintiff was not disabled as defined by the Act and, therefore, not entitled to SSI or disability benefits. (A.R. 22.)

## LEGAL STANDARD

In reviewing the ALJ's decision, the Court must determine whether it was "supported by substantial evidence and based on the proper legal criteria." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (quoting *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Under this standard, the ALJ's decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence." *Scheck*, 357 F.3d at 699 (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)). While an "ALJ is not required to mention every piece of evidence," he must establish an "accurate and logical bridge" between the evidence and his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (citing *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)). To determine if the ALJ's decision is based on substantial evidence, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. Nevertheless, the Court conducts a "critical review of the evidence" before affirming the ALJ's decision, *id.*, and "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues," *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## ANALYSIS

Under Title XVI of the Act, a disabled person is eligible for SSI benefits if that person meets certain requirements pertaining to income. 42 U.S.C. § 1381a. A claimant is disabled for the purposes of SSI eligibility "if he is unable to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Under the Act, a claimant is disabled only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Act sets forth a five-step test for determining whether a claimant qualifies for SSI benefits. 20 C.F.R. § 416.920(a). First, the ALJ must determine whether the claimant is performing a substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If the claimant is engaging in a substantial gainful activity, the claimant is not disabled. *Id.* Second, the ALJ must consider whether the claimant has a severe medically determinable impairment, or combination of impairments that meets a twelve-month duration requirement or is expected to result in death. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. If the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. § 416.920(c). Third, the ALJ must consider the severity of the claimant's impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the claimant's impairment meets or equals an impairment listed in the Act, and meets the duration requirement, then the claimant is considered disabled. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment does not meet or equal a listed impairment, the ALJ must then assess a claimant's RFC and past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(e). If a claimant can still perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). Fifth, the ALJ considers his RFC assessment in conjunction with the claimant's age, education, and work

experience to determine whether the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, he is disabled. *Id.* "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Briscoe ex. rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Here, as discussed above, the ALJ followed the five-step sequential analysis and determined that (1) Plaintiff had not engaged in substantial gainful activity since December 6, 2002, the onset date of his alleged disability; (2) Plaintiff suffered from the severe impairments of degenerative disk disease and anxiety; (3) Plaintiff's impairments did not meet or medically equal one of the listed impairments; (4) Plaintiff's RFC indicated that he could not return to his past relevant work but could perform sedentary work with limitations; and (5) Plaintiff was able to perform sedentary jobs that existed in the current economy. (A.R. 15-21.) Consequently, the ALJ concluded that Plaintiff was not disabled as defined by the Act. (A.R. 21.)

Plaintiff contends that the ALJ's step three finding that Plaintiff's impairments do not meet or equal any of the criteria for listing 1.04 is not supported by substantial evidence.[8] (R. 11, Pl.'s Br. at 10.) Specifically, Plaintiff claims that the ALJ erred in his determination that Plaintiff did not medically equal listing 1.04A or 1.04C. (*Id.* at 10, 12.) Plaintiff further alleges that the ALJ erred in his evaluation of the medical record. (*Id.* at 14,15.) The Court addresses each argument in turn.

## I.    The ALJ's Determination of Medical Equivalence

First, Plaintiff claims that the ALJ erred in his determination that Plaintiff did not meet or equal listings 1.04A or 1.04C. (*Id.* at 10, 12.) The Commissioner counters that after Plaintiff's

---

[8] Plaintiff does not dispute the ALJ's finding regarding whether his mental impairments met a listing, and thus the Court does not address the issue.

surgery in July 2006, he failed to meet or equal the requirements of either listing. (R. 24, Def.'s Mem. at 4.) The Commissioner argues in the alternative that the uncontradicted opinions of the ME and the DDS are substantial evidence in support of the ALJ's decision. (*Id.*) Due to the Court's deferential review of the ALJ's decision, the Court must affirm the decision if it is supported by substantial evidence. *Scheck*, 357 F.3d at 699. Therefore, the Court will first determine if the ALJ's step three analysis is supported by substantial evidence.

Listing 1.04 concerns disorders of the spine, such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture, which result "in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. § 404, Subpt. P, App. 1, §1.04. It requires, in relevant part:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> . . .
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.* at 1.04. In determining Plaintiff's physical impairment did not meet or equal a qualified listing, the ALJ stated:

> The claimant's degenerative disk disease does not meet or equal any of the criteria for section 1.00, because [sic] (musculoskeletal system) because there is no evidence of major dysfunction of a joint, disorder of the spine, or any of the specific neurological deficits required under this section.

(A.R. 16.)[9] The Seventh Circuit has enumerated three requirements for an ALJ's step three determination to meet the "substantial evidence" standard upon review. *Cirelli v. Astrue*, 751 F.

---

[9] The Court notes the ALJ's failure to specifically reference the listing in his step three determination. This error, however, is mitigated by the fact that the ALJ did reference listing

Supp. 2d 991, 1002 (N.D. Ill. 2010). First, the ALJ "must discuss the listing by name." *Id.* (quoting *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004)). "Second, the ALJ is required to 'offer more than a perfunctory analysis of the listing.'" *Id.* (quoting *Barnett,* 381 F.3d at 668). Finally, the ALJ "must consider an expert's opinion" on whether the claimant's impairment equals a listing. *Id.* (citing *Barnett,* 381 F.3d at 670).

The Social Security rulings instruct ALJs that they are responsible "for deciding the ultimate legal question of whether a listing is met or equaled." S.S.R. 96-6p at 3. The rulings also note, however, that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." *Id.* The Social Security regulations (the "regulations") similarly state that ALJs must "consider the opinion given by one or more medical and psychological consultants designated by the Commissioner" at the step three equivalence determination. 20 C.F.R. § 404.1526(c).

Here, the ALJ failed to consult an expert regarding medical equivalence. The ALJ never posed the question to the ME during his examination, and Drs. Richard Blinsky and Barry Free, consulting physicians that provided assessments of Plaintiff's condition to the SSA, never opined on the issue. (*See* A.R. 431-41.) In addition, the record contains none of the requisite forms, such as the SSA–831–U5, SSA–832–U5, or SSA–833–U5 form, that would otherwise satisfy the ALJ's duty to consider an expert's opinion on medical equivalence. *See* S.S.R. 96–6P at 3; *see*

---

1.04 elsewhere in his decision. (*See* A.R. 19.) The Seventh Circuit has instructed courts to "give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000) (quoting *Johnson v. Apfel,* 189 F.3d 561, 564 (7th Cir. 1999)). The ALJ inexplicably put much of his step three analysis in other parts of the opinion. Upon remand, the Court instructs the ALJ to consolidate his step three analysis for ease of judicial review.

*also Barnett*, 381 F.3d at 671. The Court cannot find any medical opinion in the record that addresses the issue of equivalency. Instead of soliciting a medical opinion on the issue, the ALJ appears to have "assumed the absence of equivalency," and he neglected to discuss it at all in his decision. *See Barnett*, 381 F.3d at 671. The Seventh Circuit has held that an ALJ's assumption about equivalency "cannot substitute for evidence and does not support the decision to deny benefits." *Id.* Accordingly, the Court cannot determine whether the ALJ's step three determination is supported by substantial evidence. The ALJ's failure to consider whether Plaintiff's impairments equaled any relevant listing warrants a remand. On remand, the ALJ should seek a qualifying medical opinion on the issue of medical equivalence and should explicitly address medical equivalence in his step three determination.

## II.    The ALJ's Evaluation of the Medical Opinions of Record

Plaintiff next argues that the ALJ erred in his evaluation of the medical record. (R. 11, Pl.'s Br. at 15.) Specifically, Plaintiff contends that the ALJ failed to adequately consider the opinions of the Stroger Hospital and Melrose Park Clinic physicians. (*Id.*) The Commissioner argues that the record demonstrates that Plaintiff failed to meet listings 1.04A or 1.04C after his July 2006 surgery. (R. 24, Def.'s Mem. at 4.)

The regulations distinguish between treating and nontreating sources. *See* 20 C.F.R. § 416.902. A treating source or physician is one that has "an ongoing treatment relationship with [the claimant]." *Id.* A treating source's opinion is generally given greater weight because that physician is "able to provide a detailed, longitudinal picture of [the claimant's] impairments." 20 C.F.R. § 416.927(c)(2). The regulations instruct ALJs to give controlling weight to the medical opinion of a treating physician if it is well-supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. *Id.* An ALJ should "always give good

reasons in [his] notice of determination or decision for the weight [he] give[s][a] treating source's opinion." *Id.*

Conversely, a nontreating source means "a physician, psychologist, or other acceptable medical source who has examined [claimant] but does not have, or did not have, an ongoing treatment relationship with [claimant]." 20 C.F.R. § 416.902. An ALJ is required to determine the weight a nontreating source's opinion deserves considering such factors as: the length, nature and extent of the treatment relationship; the consistency of the opinion with the record as a whole; and how well supported the opinion is by medical signs and laboratory findings. *See* 20 C.F.R. § 416.927(c). Regardless of its source, the ALJ "will evaluate every medical opinion [it] receive[s]." *Id.*

### A. Melrose Park Clinic Record

Plaintiff argues that the ALJ ignored evidence from the Melrose Park Clinic. (R. 11, Pl.'s Br. at 15.) The ALJ failed to address the Melrose Park Clinic record or Dr. Madison's findings that Plaintiff suffered from failed back surgery syndrome anywhere in his opinion. Before the Court determines the proper weight the ALJ should have afforded the Clinic more weight, it must first establish whether the Clinic is a treating or nontreating source.

The record contains over 100 pages of materials from the Clinic. (A.R. 519-647.) Because Plaintiff attended the Clinic for over seven years, the Court cannot determine with complete clarity how many evaluations Plaintiff underwent or how many physicians attended to Plaintiff there. (*Id.*) Nonetheless, the Court finds that the Clinic records fall squarely within the treating source category because of Dr. Madison's ongoing relationship with Plaintiff. Plaintiff received treatment from the Clinic for over seven years, which meets any reasonable definition of "ongoing." In particular, Dr. Madison, who diagnosed Plaintiff as suffering from failed back

surgery syndrome, saw Plaintiff at least four times between October 2010 and May 2011. (A.R. 613-45.) Additionally, Plaintiff's visits to the Clinic were based on his need for treatment, not to obtain a report in support of his claim for disability. *See* 20 C.F.R. § 416.902 ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.") The Court thus determines that the Clinic was a treating source.

The regulations require the ALJ to consider the Clinic records and Dr. Madison's assessment in determining whether Plaintiff met or equaled listings 1.04A or 1.04C. *See* 20 C.F.R. § 416.927(c). In particular, the ALJ was required to consider Dr. Madison's repeated findings that Plaintiff suffered from failed back surgery syndrome at the L3-L4 and L4-L5 disks. (A.R. 618.) While an ALJ may decline to afford controlling weight to a treating source's opinion if it is inconsistent with other substantial medical evidence, he must explain what evidence he found to diminish its value. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Given the ALJ's failure to even reference the Melrose Park record or Dr. Madison's opinion, this Court cannot determine if the ALJ had "good reasons" for declining to afford the Clinic records controlling weight. *See id.*; *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999). On remand, the ALJ must consider all the medical evidence of record and provide good reasons for the weight he affords the Melrose Park Clinic record and Dr. Madison's opinion. *See* 20 C.F.R. § 416.927(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).

### B.     Stroger Hospital Record

Plaintiff also contends that the ALJ improperly rejected the Stroger Hospital record. (R. 11, Pl.'s Br. at 12, 15.) In assessing the proper weight the ALJ must afford to the Stroger

Hospital record, the Court must establish whether Stroger Hospital qualifies as a treating or nontreating source. In this case, there is no evidence, nor has Plaintiff alleged, that Plaintiff had an "ongoing treatment relationship" with the physicians at Stroger Hospital. Plaintiff was referred to Stroger Hospital by the Clinic for one test, an MRI, and he returned to Stroger Hospital only to receive the results. (*Id.* at 9.) This was the extent of his "relationship" with Stroger Hospital. Plaintiff fails to provide any evidence that his brief interaction with Stroger Hospital provided the "longitudinal view" required to qualify the physicians there as treating sources. If a medical source's opinion provides no longitudinal view, "the very reasons the Social Security regulations set out for giving substantial weight to a treating physician's opinion are absent." *Scheck*, 357 F.3d at 702-03. Therefore, the Court holds that Stroger Hospital was a nontreating source.

Having established that Stroger Hospital is a nontreating source, the Court must determine if the ALJ afforded the proper weight to the record. An ALJ must determine the appropriate weight to afford a nontreating physician's opinion "by examining how well [the nontreating physician] supported and explained his opinion, whether his opinion is consistent with the record, whether [the nontreating physician] is a specialist in pain disorders, and any other factor of which the ALJ is aware." *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). *See also* 20 C.F.R. § 416.927(c)(1)-(6). Here, the ALJ stated that he found an inconsistency between Dr. Regan's assessment in June 2010 that Plaintiff was improving and the January 2011 Stroger Hospital records indicating that Plaintiff suffered from multilevel degenerative disk disease and failed back surgery syndrome and was "completely disabled." (A.R. 19.) The ALJ explained further that although the Stroger Hospital record demonstrated that Plaintiff met listing

1.04, he relied on the ME's opinion that there was "not enough testing to verify the Stroger record." (*Id.*)

Although the ALJ's explanation of his decision to reject the Stroger Hospital record is brief, especially considering that he found the record would be dispositive of Plaintiff's ability to meet listing 1.04 if taken as true, the Court cannot conclude that the ALJ erred in his decision to reject the Stroger Hospital record. If an ALJ discounts an opinion after considering the factors set forth in the regulations, the Court "must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons—a very deferential standard that [the Court has], in fact, deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (internal citations and quotations omitted). Here, by discussing the Stroger Hospital record's inconsistency and lack of support in the record, the ALJ adhered to the regulations and minimally articulated his rationale for rejecting the record. Accordingly, the Court finds that the ALJ did not err in his rejection of the Stroger Hospital record.

## CONCLUSION

For the reasons stated above, the Court DENIES the Commissioner's motion for summary judgment (R. 23). The Court reverses the ALJ's decision and remands this case for further proceedings consistent with this opinion pursuant to 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter a final judgment in favor of Plaintiff.

ENTERED: _____
**Chief Judge Ruben Castillo**
**United States District Court**

Dated: **November 20, 2013**